Matter of P. C. v Stony Brook Univ. (2023 NY Slip Op 05604)

Matter of P. C. v Stony Brook Univ.

2023 NY Slip Op 05604

Decided on November 8, 2023

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 8, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ANGELA G. IANNACCI, J.P.
LINDA CHRISTOPHER
LARA J. GENOVESI
WILLIAM G. FORD
LILLIAN WAN, JJ.

2021-02858
 (Index No. 612308/20)

[*1]In the Matter of P. C., petitioner,
v
Stony Brook University, et al., respondents.

Barket Epstein Kearon Aldea & LoTurco, LLP, Garden City, NY (Donna Aldea and Alexander R. Klein of counsel), for petitioner.
Letitia James, Attorney General, New York, NY (Anisha S. Dasgupta and Elizabeth Brody of counsel), for respondents.

DECISION & JUDGMENT
Proceeding pursuant to CPLR article 78, inter alia, to review a determination of the Stony Brook University Appeals Committee dated March 31, 2020. The determination affirmed a determination of the Review Panel of Stony Brook University dated February 28, 2020, made after a hearing, finding the petitioner responsible for violating certain sections of the Stony Brook University Code of Student Responsibility and, inter alia, suspended the petitioner until December 17, 2021.
ADJUDGED that the petition is granted, on the law, with costs, the determination of the Stony Brook University Appeals Committee dated March 31, 2020, is annulled, the penalties imposed are vacated, the charges that the petitioner violated certain sections of the Stony Brook University Code of Student Responsibility are dismissed, and the respondent Stony Brook University is directed to expunge all references to the finding from the petitioner's academic record.
The petitioner, a student at Stony Brook University (hereinafter the University), commenced the instant CPLR article 78 proceeding to challenge a determination that he violated certain sections of the University's Code of Student Responsibility (hereinafter Student Code) by engaging in various forms of sexual misconduct against fellow student S.G. While the noticed charges were based upon S.G.'s alleged incapacity to consent due to intoxication, the University never made a determination on the issue of incapacitation, deciding only that S.G. did not affirmatively consent to the sexual conduct. As conceded by the respondents, our review of the determination is thus limited to the issue of affirmative consent, as opposed to incapacitation.
The record evidence demonstrated as follows. The petitioner was first introduced to S.G. by a mutual friend—V.L.—at a school event on campus on the night of September 7, 2019. S.G. and V.L. were drinking alcohol at the event and S.G. continued to drink alcohol throughout the night and into the next morning. S.G., V.L., and the petitioner spent time together after the event in S.G.'s dormitory, and, around midnight, S.G. and the petitioner dropped V.L. off at another dormitory and went for a walk on a trail in the woods on campus.
According to S.G.'s statement, while in the woods, she and the petitioner "were both ready for things to start escalating" but the petitioner "kept saying it was a bad idea" because V.L. had told him "how mad [V.L.] would be if anything were to happen between" the petitioner and S.G. According to S.G., she "kept telling [the petitioner] it would be fine," insisting that she could make her own decisions, and "eventually . . . told him to just leave" and that she would walk back through the woods and to her dormitory by herself. When the petitioner "wouldn't let [her] do that," S.G. told him: "leave me alone." According to S.G., she and the petitioner then engaged in sexual contact, including oral sex, and she did not remember who initiated it but she remembered "at the moment being okay with everything."
The petitioner and S.G. then walked to a store to purchase more alcohol. S.G. indicated that, as she and the petitioner started walking back to the woods, she asked the petitioner if he had bought condoms. Since he had not, they walked back to the store and the petitioner bought condoms at S.G.'s insistence.
According to S.G., when she and the petitioner returned to the woods, "clothes came off and the intercourse started." S.G. asserted that she had only "snapshot memories" of what occurred due to her intoxication. S.G. related that the petitioner wanted to have sex in S.G.'s car and she "caved" even though she wanted to "stay in the woods." S.G. and the petitioner then walked through the parking lot and S.G. brought the petitioner to her car. The petitioner opened the passenger side back door and got into the back seat. S.G. got into the back seat from the drivers' side. The petitioner and S.G. then engaged in sexual intercourse in the car. At one point, S.G. felt like she may have passed out or that she was "dreaming" and "woke up from being asleep." S.G. and the petitioner got dressed, got out of the car and S.G. returned to her dormitory. S.G. texted a friend to pick her up, reporting that "bad stuff happened" and that she "had sex with someone blacked out." Later that day, the petitioner's and S.G.'s friend V.L., made a Title IX report to the University regarding the encounter.
During the course of the Title IX investigation, the University obtained a series of text messages between the petitioner and V.L., in which the petitioner admitted to V.L. that, contrary to her directive, he had engaged in sexual relations with S.G. The petitioner stated in the message that although he "just sorta went along with it," he "made [his] choice," he was "sorry" and he knew he "f-ed up." When questioned about this text message exchange during the investigation, S.G. characterized it as follows: "he apologized for stuff [through Facebook Messenger] but not for what actually happened. He seemed to apologize for breaking his promise" to V.L.
At the conclusion of the investigation, the petitioner was charged with violating sections of the Student Code prohibiting sexual harassment (Student Code section VII.C.6.a), non-consensual sexual contact (Student Code section VII.C.6.b), and non-consensual sexual intercourse (Student Code section VII.C.6.c) (Although S.G. asserted that the petitioner had choked her during sex, the petitioner was not charged with violating Student Code section VII.C.6.d, which prohibits nonconsensual physical violent contact during sexual contact, including choking). The Notice of Charges provided to the petitioner advised him: "it is alleged that you engaged in sexual contact with a female student while she was incapacitated due to alcohol and unable to give consent."
A hearing was held on the charges before the University's Review Panel, at which S.G. gave a statement and answered questions. The petitioner exercised what the University acknowledged to be "his right not to answer" most of the questions posed to him. The Review Panel also viewed surveillance video depicting S.G. and the petitioner walking together on campus at various points during the night and morning in question. The videos showed S.G. walking normally and independently, and showed her locating her car in the parking lot, unlocking it, opening both the driver's side front and rear doors, and getting inside the back seat with the petitioner.
In her closing argument, S.G. asserted that, due to her level of intoxication, if she had insisted on "getting a tattoo" or "putting a down payment on a house," "nobody" would have allowed her to do so. She continued: "I don't think it should make a difference that, in this case, instead of getting a tattoo or putting down a down payment, it was consenting to sex. Because in the end, I was [*2]too intoxicated to be making that decision that night" (emphasis added).
By determination dated February 28, 2020, the Review Panel found the petitioner responsible for all three charges and suspended the petitioner through December 17, 2021. The Review Panel found that "regardless of whether [S.G.] was or was not incapacitated by alcohol," the petitioner committed the violations because he had not obtained affirmative consent for the sexual acts in which he and S.G. engaged. In support of that determination, the Review Panel cited the petitioner's text message to V.L. indicating that he had "f-ed up" and the petitioner's "inability or unwillingness to identify the words or actions of [S.G.] that provided affirmative consent." The University Appeals Committee affirmed in a determination dated March 31, 2020. The petitioner thereafter commenced the instant CPLR article 78 proceeding, inter alia, to review that determination, which proceeding was transferred to this Court (see CPLR 7804[g]).
In reviewing the University's disciplinary determination made after a hearing, this Court may not "review the facts generally as to weight of evidence" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045 [internal quotation marks omitted]). Rather, judicial review is limited to whether the administrative determination is supported by substantial evidence (see CPLR 7803[4]; Matter of Doe v Purchase Coll. State Univ. of N.Y., 192 AD3d 1100, 1102). Substantial evidence is a "minimal standard" which means "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1045, 1046 [internal quotation marks omitted]).
The Student Code defines "[a]ffirmative consent" as a "knowing, voluntary and mutual decision" to "engage in sexual activity" (Student Code section VII.C.7; see Education Law § 6441[1]). "Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity" (Student Code section VII.C.7; see Education Law § 6441[1]). Further, under the Student Code, "[c]onsent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity" (Student Code section VII.C.7.a.v). "Depending on the degree of intoxication, someone who is under the influence of alcohol . . . may be incapacitated" (Student Code section VII.C.7.a.vi).
Here, the Notice of Charges to the petitioner, as well as the determinations of the Review Panel and Appeals Committee, describe all of the charges as being based upon the allegation that the petitioner engaged in sexual activity with S.G. "while she was incapacitated due to alcohol and unable to give consent." S.G.'s position in both the written statement provided to the investigator and her testimony at the hearing, as most clearly encapsulated in her closing statement, in which she referred to herself "consenting to sex" and "making that decision," was not that she declined to or withheld consent, but that she was too intoxicated to make that decision knowingly and voluntarily.
Yet, as the University concedes, the Review Panel did not find that S.G. was incapacitated by intoxication. Thus, as the University correctly asserts in its brief, "arguments about whether [it] should or should not have found S.G. incapacitated are not properly before this Court" (see Matter of Save America's Clocks, Inc. v City of New York, 33 NY3d 198, 209). Since there was no finding on incapacitation, the only question before this Court is whether substantial evidence showed that S.G., while able to consent, nevertheless did not do so.
We answer that question in the negative, as the evidence the Review Panel relied upon to support the determination that S.G. did not consent to the sexual activity she engaged in with the petitioner, despite being able to do so, was inadequate to support that conclusion (see Matter of Doe v Purchase Coll. State Univ. of New York, 192 AD3d at 1102 [where a university hearing board rejected the complainant's testimony that she was incapable of giving consent, there was insufficient evidence to prove that she had not given affirmative consent]). According to S.G.'s own testimony, her statement "leave me alone," which was quoted by the Review Panel, was not a response to sexual advances by the petitioner, but to his hesitation to engage in sexual conduct with her due to his promise to their friend V.L. and his refusal to leave her alone in the woods to get back to her [*3]dormitory by herself. Other statements by S.G. quoted by the Review Panel, relating to her lack of memories and the events that occurred in the car, might have provided support for a finding of incapacitation. Absent that, however, S.G.'s failure to remember the events at issue does not serve to prove or disprove a lack of affirmative consent.
The piece of the text message to V.L. that the Review Panel relied upon—i.e., the vague statement that the petitioner "f-d up"—could not have been reasonably interpreted as reflecting consciousness of guilt as the Review Panel suggested and our colleagues in the dissent conclude (cf. Matter of Haug v State Univ. of N.Y. at Potsdam, 149 AD3d 1200, 1206 [Clark, J., dissenting], revd 32 NY3d 1044 [text message to complainant indicating that the petitioner was worried that she had reported him for rape evinced consciousness of guilt]). Indeed, even S.G. did not interpret the message as any acknowledgment of guilt for the petitioner's conduct toward her, but, rather, as an apology for his broken promise to V.L.
Finally, the Review Panel's reliance upon the petitioner's decision not to answer questions or provide explanations contravenes the provision of the Student Code providing that a respondent charged with sexual misconduct "enjoys a presumption of not responsible unless and until proven by a preponderance of the evidence" (Student Code section VII.D; see People v Bac Tran, 80 NY2d 170, 178).
In sum, "[h]aving rejected [S.G.'s] testimony that she was incapable of giving consent, the Review Panel was not left with adequate evidence to support the conclusion" that S.G. had not affirmatively consented to the sexual conduct in which she engaged with the petitioner (Matter of Doe v Purchase Coll. State Univ. of New York, 192 AD3d at 1102). Indeed, the evidence in the record as to S.G.'s words and actions was that she was "ready for things to start escalating," that she was "okay with everything" that was happening, and, while believing herself capable of getting back to her dormitory alone, that she walked with the petitioner to a store where she asked him to buy condoms. While it is possible that S.G., as she reported afterward, "had sex with someone blacked out" and was incapable of "making that decision" to consent to sex, these were not the findings the Review Panel made. Notably, while the record clearly provided evidence of S.G.'s consent to certain sexual activities (assuming her capacity to do so), the Review Panel made no effort to identify which sexual activities were engaged in without consent.
Since the Review Panel's determination that the petitioner violated the provisions of the Student Code was not supported by substantial evidence, we grant the petition, annul the determination, vacate the penalties imposed, dismiss the charges, and direct the University to expunge all references to those findings from the petitioner's academic record.
IANNACCI, J.P., CHRISTOPHER and GENOVESI, JJ., concur.
WAN, J., dissents, and votes to confirm the determination dated March 31, 2020, deny the petition, and dismiss the proceeding on the merits, with the following memorandum, in which FORD, J., concurs:
I respectfully disagree with the conclusion reached by my colleagues in the majority to grant the petition and annul the determination. In my view, the Review Panel's determination was supported by substantial evidence.
On or about September 8, 2019, the respondent Stony Brook University (hereinafter the University) received a complaint against the petitioner, a student at the University, alleging that the petitioner engaged in "unfair treatment based upon sex" toward another University student (hereinafter the complainant). From September 30, 2019, through December 30, 2019, Kathryn Santiago, Title IX Investigator and Deputy Title IX Coordinator from the University's Office of Institutional Diversity and Equity, conducted an investigation of the complaint. Based upon this investigation, on December 30, 2019, the University provided the petitioner with a Notice of Charges, which charged the petitioner with violating three provisions of the University's Code of Student Responsibility. The Notice of Charges stated that the University "received a report about [*4]an incident that occurred on or about September 7, 2019-September 8, 2019 in the woods on campus and in the complainant's vehicle located in the West Apartment parking lot, where it is alleged that you engaged in sexual contact with a female student while she was incapacitated due to alcohol and unable to give consent." More specifically, the Notice of Charges alleged that the petitioner "[t]ouched the breast and genitals of the complainant both in the woods and in the complainant's vehicle," "[e]ngaged in oral sex with the complainant both in the woods and in the complainant's vehicle," "[s]pat in the mouth of the complainant during sexual intercourse in the woods," "[c]hoked the complainant during sexual intercourse in the woods," "[v]aginally penetrated the complainant with [his] penis, both in the woods and in the complainant's vehicle," and "[v]aginally penetrated the complainant with [his] penis without a condom in the complainant's vehicle." The Notice of Charges stated that if these allegations were to be substantiated, then the petitioner would be in violation of those provisions of the Code of Student Responsibility concerning sexual harassment, nonconsensual sexual contact, and nonconsensual sexual intercourse and/or penetration [FN1]. The Notice of Charges also provided the time and date of a hearing at which the petitioner could contest the charges.
Prior to the hearing, Santiago prepared an Investigative Report, dated February 6, 2020, based upon her investigation of the complaint. According to the Investigative Report, Santiago interviewed the complainant on September 17, 2019, October 18, 2019, and October 24, 2019. The complainant also submitted a written statement on November 5, 2019, and provided additional information on November 15, 2019. Santiago also interviewed three other University students and reviewed, among other things, the complainant's Title IX Report Submission Form dated September 8, 2019, a partial Facebook Messenger history between University student V.L. and the petitioner dated September 8 and 9, 2019, and surveillance camera footage dated September 8, 2019. The petitioner declined to participate in the investigation.
On February 14, 2020, the University conducted a hearing before the University's Review Panel. During her closing argument, the complainant argued, among other things, that the record before the Review Panel did not show how the petitioner had obtained the complainant's affirmative consent "throughout the entire night." After the hearing, the Review Panel found the petitioner "responsible" for the three charges. A written disposition dated February 28, 2020, stated, inter alia, that the Review Panel considered the Investigative Report and exhibits, plus the statements made by the petitioner and the complainant at the hearing. Based upon this evidence, the Review Panel found that the complainant "stated both in the Investigative Report and in the hearing" that the petitioner engaged in unwelcome sexual advances towards her; that she told the petitioner to "leave me alone" while they were in the woods together; and that she did not want the petitioner to choke her during sexual intercourse and that she would not have allowed that to happen if she were not intoxicated. The Review Panel further found that the complainant stated in the Investigative Report and testified at the hearing that she had "[l]ittle to no memory" of walking to her car, remembered "even less of what happened" once inside her car, and that, while in her car, she felt as though she was dreaming and she "sat up abruptly during intercourse and asked [the petitioner] if I had passed out. I told him that I was dreaming, that it felt like I woke up from being asleep and then he told me I was 'only out for a second.'" The written disposition also highlighted an exhibit to the Investigative Report, i.e., a "text message in which the [petitioner] stated to [student V.L.] that he engaged in intercourse with the Complainant and that he 'fucked up.'"
The written disposition noted that the petitioner "declined to participate in the Title IX investigation and did not provide a statement to the Title IX investigator." Additionally, "[a]t the hearing, upon the advice of his counsel who was present at the hearing, the [petitioner] declined to [*5]answer most questions asked of him," but provided a statement, "the bulk of which addressed his denial of the Complainant's contention that she was unable to consent because she was incapacitated due to her extreme intoxication." The written disposition acknowledged that in support of his denial of the complainant's contention, the petitioner "presented several video clips which he argued demonstrated that the Complainant was not incapacitated by alcohol because the video showed that she was able to walk unaided, correctly identify her vehicle and guide [the petitioner] to it, walk back to her dorm, and then leave with a friend shortly thereafter."
Upon consideration of all the available evidence, the Review Panel "determined that regardless of whether the Complainant was or was not incapacitated by alcohol, the [petitioner]'s admission that the sex acts occurred as evidenced by his text message to [student V.L.], which message was proximate in time to the time of their occurrence, in which he confided that he 'fucked up' and [the petitioner]'s inability or unwillingness to identify the words or actions of the Complainant that provided affirmative consent supported a finding by a preponderance of evidence" that the petitioner was responsible for the charges. As a sanction, the petitioner was suspended from the University through December 17, 2021.
The Review Panel's determination was upheld on administrative appeal to the Appeals Committee in a determination dated March 31, 2020 (hereinafter the subject determination). The petitioner thereafter commenced a CPLR article 78 proceeding to annul the subject determination, which was transferred to this Court for determination.
As acknowledged by the majority, in reviewing the University's disciplinary determination, made after a hearing, this Court has "'no right to review the facts generally as to weight of the evidence'" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045, quoting Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 230). Rather, this Court is limited to assessing whether the determination is supported by substantial evidence (see Matter of Wright v State Univ. of N.Y. Mar. Coll., 179 AD3d 1080, 1081).
The "'substantial evidence standard is a minimal standard'" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1045, quoting Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d 179, 188). It is "'less than a preponderance of the evidence' and 'demands only that a given inference is reasonable and plausible, not necessarily the most probable'" (Matter of Noonan v Chong, 186 AD3d 713, 714, quoting Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1045-1046). "Stated differently, . . . substantial evidence is 'such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact'" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1046, quoting 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 180). "Where substantial evidence exists to support a decision being reviewed by the courts, the determination must be sustained, irrespective of whether a similar quantum of evidence is available to support other varying conclusions" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1046 [emphasis added and internal quotation marks omitted]). "'It is the function of the administrative agency, not the reviewing court, to weigh the evidence, assess the credibility of witnesses, and determine which testimony to accept and which to reject. Where evidence is conflicting and room for choice exists, a reviewing court may not weigh the evidence or reject the choice made by the administrative agency'" (Matter of Noonan v Chong, 186 AD3d at 714, quoting Matter of Mundinger v Smithtown Cent. Sch. Dist., 152 AD3d 607, 607). Rather, "the duty of weighing the evidence and making the choice between conflicting inferences lies exclusively within the province of" the University (Matter of Haug v State Univ. of N.Y. at Potsdam, 149 AD3d 1200, 1206 [Clark, J., dissenting], revd 32 NY3d 1044 [internal quotation marks omitted]).
Since the University did not make a finding on incapacitation, the question before this Court is whether substantial evidence established that the complainant did not affirmatively consent to all of the sexual activity engaged in by her and the petitioner (see Matter of Jacobson v Blaise, 175 AD3d 1629, 1632). As required by Education Law § 6441(1), the Code of Student Responsibility defines "affirmative consent" as the following: "Affirmative consent is a knowing, voluntary, and [*6]mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression."
Moreover, the Code of Student Responsibility, as required by Education Law § 6441(2)(a), states that "[c]onsent to any sexual act or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act."
Here, the Review Panel was presented with competing versions of events, each of which could reasonably support conflicting conclusions. To that end, contrary to the petitioner's contention, the determination that the petitioner violated the Code of Student Responsibility was supported by substantial evidence (see Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1045-1047). The evidence proffered at the hearing included the complainant's testimony that the petitioner engaged in various conduct, including choking her in the woods and having sexual intercourse with her in her car, without her affirmative consent. Moreover, "it was the province of the hearing board to resolve any conflicts in the evidence and make credibility determinations" (id. at 1046), and, here, the Review Panel determined that the complainant's testimony at the hearing was consistent with her statements to the Title IX investigator, made many months prior to the hearing.
This case is distinguishable from Matter of Doe v Purchase Coll. State Univ. of N.Y. (192 AD3d 1100), cited by the majority. In that case, this Court, in finding that there was not substantial evidence that the complainant did not consent to certain sexual activity, concluded that "[t]here was no specific testimony or statements elicited that were adequate to support the conclusion that, although capable of consent, the complainant had not consented, with her actions, to all of the sexual activity in which the parties engaged" (id. at 1103). Here, however, such testimony and statements exist. In her Title IX Statement, the complainant stated that she "snapped back into it at some point because of how hard he was choking me. I remember trying to pry his hands off my neck, but he was stronger than I was and did not budge at all. He was behind me and I was facing toward the ground while this occurred." Similarly, at the hearing, the complainant testified that she "became present in the moment because of how aggressive he was being, how I felt like I couldn't breathe and tried to get his hands off my throat. He wasn't budging and I don't know what happens after that because I blacked out again." Concerning the sexual activity in the complainant's car, in both her Title IX Statement and at the hearing, the complainant stated that she did not want to have sex in her car, that she and the petitioner should just stay in the woods, and that she voiced "being uncomfortable and concerned about doing anything and voicing that because people can see us." These statements and testimony, in addition to those statements and testimony expressly relied upon by the Review Panel in the written disposition, constitute substantial evidence that the complainant did not affirmatively consent to all the sexual activity in which she and the petitioner engaged (see Matter of Jacobson v Blaise, 175 AD3d at 1632 [University properly concluded that, "even if [the complainant] were not incapacitated during the period in question, [she] never affirmatively consented to sexual intercourse with petitioner"]).
Additionally, contrary to the conclusion reached by my colleagues in the majority, the Review Panel could have reasonably interpreted the petitioner's statements in a text message to student V.L., made proximate in time to the incident, as consciousness of guilt, regardless of how the complainant may have interpreted V.L.'s response to those statements (see Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1046; Matter of Wittenberg v Purchase Coll., S.U.N.Y., 176 AD3d 835, 837). In addition to his statement that he "fucked up," the petitioner also stated in a text message that "if I had been sober, I would've been thinking more straight and I wouldn't have hurt her nor broken your trust" (emphasis added). The resolution of any conflicting inferences to be drawn from the petitioner's statements in these text messages rests solely with the University (see Matter of Collins v Codd, 38 NY2d 269, 270-271).
Since substantial evidence exists to support the determination, this Court must not engage in a re-weighing of the evidence and the determination must be sustained, "irrespective of whether a similar quantum of evidence is available to support other varying conclusions" (Matter [*7]of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d at 1046 [internal quotation marks omitted]).
Contrary to the conclusion reached by my colleagues in the majority, the Review Panel did not contravene the provision in the Code of Student Responsibility affording a respondent charged with sexual misconduct "a presumption of not responsible unless and until proven otherwise by a preponderance of the evidence." Notably, neither party has argued for a particular meaning of the phrase "presumption of not responsible" within the context of these administrative proceedings. Moreover, since the administrative hearing at issue was not a criminal proceeding, the petitioner's constitutional right against self-incrimination was not implicated (see Spata v Kelly, 219 AD3d 773). Additionally, the Review Panel members followed the Code of Student Responsibility, which provides that the Review Panel members "may question the Respondent regarding the opening statement and information in defense of allegation(s)." In any event, even without the petitioner's refusal to "identify the words or actions of the Complainant that provided affirmative consent," the record before the Review Panel, as discussed above, contained substantial evidence that the petitioner was responsible for the three charges against him.
Accordingly, I would confirm the subject determination, deny the petition, and dismiss the proceeding on the merits.
ENTER:
Darrell M. Joseph
Acting Clerk of the Court

Footnotes

Footnote 1: As the majority notes, the petitioner was not charged with violating the section of the Code of Student Responsibility prohibiting "[n]on-consensual physical violent contact during sexual contact" (Code of Student Responsibility section VII.C.6.d). However, as noted above, the Notice of Charges expressly charged that the petitioner "[c]hoked the complainant during sexual intercourse in the woods."